**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| WESTFIELD INSURANCE COMPANY, | ) |
| an Ohio Corporation, | ) |
|        Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LG CONSTRUCTION GROUP, LLC, an | ) |
| Illinois limited liability company; and | ) |
| LAURA RICKETTS, as sole beneficiary with | ) |
| power of direction under the Trust Agreement | ) |
| dated April 15, 2010 and known as Trust No. | ) |
| 8002354843, | ) |
|        Defendants. | ) |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Westfield Insurance Company ("Westfield"), an Ohio corporation, by Amundsen Davis, LLC, pursuant to 28 U.S.C. §§ 2201 and 2202, for its Complaint for Declaratory Judgment against Defendants, LG Construction Group, LLC, an Illinois limited liability company ("LG"), and Laura Ricketts ("Ricketts"), as sole beneficiary with power of direction under the Trust Agreement dated April 15, 2010 and known as Trust No. 8002354843 ("Trust"), states as follows:

## I.    JURISDICTION

1.     The jurisdiction of the Court is premised upon 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## II.    VENUE

2.     Venue is premised upon 28 U.S.C. § 1391 in that each defendant is a resident of this District as defined by 28 U.S.C. § 1391(c) and a substantial part of the events or omissions

giving rise to this suit occurred in this District.

### III.    THE PARTIES

3.      At all times relevant herein, Westfield was an Ohio corporation, with its principal place of business in Westfield Center, Ohio and was authorized to issue policies of insurance in the State of Illinois. Westfield issued certain policies of insurance to LG as detailed herein.

4.      At all times relevant hereto, LG was an Illinois limited liability company, the sole member of which was LG Development Group LLC, also an Illinois limited liability company, the members of which are Brian Goldberg, Matt Wilke, Cuda Development Group LLC and ML Development Group LLC. Brian Goldberg and Matt Wilke are citizens of Illinois. Cuda Development Group LLC is an Illinois limited liability company, the sole member of which is Barry Howard, who is a citizen of Illinois. ML Development Group LLC is an Illinois limited liability company, the sole member of which is Marc Lifshin, who is a citizen of Illinois.

5.      At all times relevant hereto, Ricketts was a citizen of the State of Illinois and was the sole beneficiary with power of direction under the Trust.

6.      At all times relevant hereto, the Trust held title to the property at 430 Sheridan Road, Wilmette, Illinois ("Property"), on which the Project described below was constructed.

7.      Ricketts is the underlying claimant in the Second Amended Demand for Arbitration described herein and has named LG as the respondent in said Demand. She is named as a necessary party to this action to adjudicate insurance coverage under the Westfield policies. In the event that Ricketts stipulates to be bound to this Court's judgment, Westfield will move to dismiss her from this action.

### IV.    THE DEMAND FOR ARBITRATION

8.      On August 1, 2019, Ricketts filed a Demand for Arbitration against LG in the

American Arbitration Association ("AAA").

9.      Thereafter, Ricketts filed a Second Amended Demand for Arbitration against LG in the AAA, No. 01-19-0002-4280-1, consolidated with No. 02-19-0002-4282-1 (hereafter the "Demand"). A copy of the Demand, without its exhibits, is attached hereto as **Exhibit A**.

10.     The Demand alleges that Ricketts is the sole beneficiary of the Trust and, as such, has the sole right to possess, manage, repair, maintain, and handle the Property. (**Ex. A**, ¶ 1) The Trust and Ricketts are collectively referred to as the "Owner" of the Property. (*Id.*, ¶ 2)

11.     In allegations regarding the "Nature of the Dispute," the Demand alleges that in September 2012, Ricketts retained LG, a contractor, to construct a new, custom-built "luxury single-family home" in Wilmette, Illinois (hereafter the "Project"). (*Id.*, ¶ 8)

12.     The Demand alleges that, in the summer of 2016, Ricketts received a home that was "riddled with significant construction defects" and "unfinished work" as a result of LG's failure to properly construct, coordinate, manage, and complete the Project in accordance with the Project Contract Documents. (*Id.*, ¶¶ 8-10)

13.     The Demand alleges that, in certain circumstances, the "defects" were so extensive that Ricketts and her family became concerned about health and safety issues, specific examples of which are set forth in the Demand. (*Id.*, ¶¶ 10-12)

14.     The Demand alleges that punch lists were prepared but many of the listed items remained "unfinished and were never addressed by LG." (*Id.*, ¶ 13)

15.     The Demand alleges that, as a result of numerous defects, unfinished work and safety and health concerns, it will cost "millions of dollars to remediate the damages and bring the [Project] back to the condition LG was contractually required to provide." (*Id.*, ¶ 14)

16.     The Demand alleges that Ricketts and LG entered into a contract in connection

with the Project (hereafter the "Construction Agreement"). (*Id.*, ¶19) A copy of the Construction Agreement is attached as **Exhibit B** hereto and incorporated herein by reference.

17.     Thereafter, the Construction Agreement was modified by change orders. (*Id.*, ¶ 20)

18.     The Demand alleges that LG was obligated to construct the Project in accord with the Construction Agreement and industry standards. (*Id.*, ¶ 26-27, 31-32)

19.     The Demand alleges that LG represented to Ricketts that it had the experience and skill to provide  the necessary work product and attention to detail on extremely complex, multi-million dollar complex luxury homes such as the Project. (*Id.*, ¶ 30)

20.     The Demand alleges that LG's work at the Project was "defective" and "remains incomplete." (*Id.*, ¶ 33)

21.     In allegations regarding "Construction of the Project," the Demand alleges, on information and belief, that LG entered into subcontracts with various trades, vendors, and suppliers to perform work at and for the Project. (*Id.*, ¶ 34)

22.     The Demand alleges, on information and belief, that LG engaged "LG Construction + Development" to assist LG with the management and construction of the Project, and, on information and belief, LG Construction + Development, on behalf of and acting with the full authority of LG, entered into additional subcontracts with various other trades, vendors, and suppliers with respect to the Project. (*Id.*, ¶ 35, 36)

23.     The Demand alleges LG's "failure and inability to properly manage" the Project, led to "defects, omissions, and lack of coordination in the performance of [w]ork," resulting in a delay in the progression and completion of work for the Project. (*Id.*, ¶¶ 37-39)

24.     The Demand alleges that, after Ricketts began occupying the home, she began to

identify and continues to identify considerable defective, incomplete and missing work. (*Id.*, ¶ 40)

25.     The Demand pleads a single count entitled "Breach of the Construction Agreement." *Id.*, pp. 11-27. It alleges that the Construction Agreement is a valid and enforceable contract, that Ricketts performed her obligations under it, and that LG breached it in numerous ways, including "failing to perform the [w]ork in accordance with the Contract Documents." (*Id.*, ¶ 46-48) Sub-paragraphs a. through j. of ¶ 48 allege the particular ways in which LG allegedly breached the Construction Agreement and are incorporated herein by reference. (*Id.*)

26.     The Demand alleges that examples of the "incomplete and/or defective [w]ork performed by LG" includes  millwork; painting, wallcoverings, plaster (wall finishes); windows; doors; hardwood flooring; stone; tile; carpentry; electrical; plumbing; HVAC; radiant heating system; and building envelope and water infiltration. (*Id.*, ¶ 49)

27.     The Demand alleges that Ricketts "has been damaged by LG's defective [w]ork and its failure to perform the [w]ork in accordance with the Construction Agreement and industry standards, customs, and practice" and Ricketts will "continue to incur significant costs to remediate and repair the defects and deficiencies to the Project caused by LG." (*Id.*, ¶ 51)

28.     The Demand alleges that Ricketts has identified additional defective and/or inoperable work and is in the process of obtaining pricing to "remediate" such work. (*Id.*, ¶ 52)

29.     The Demand alleges that Ricketts has been further damaged in that she already paid for various remediation services with respect to the HVAC and water infiltration systems at the Property. (*Id.*, 53)

30.     The Demand alleges that, as a direct and proximate result of LG's breaches of the Construction Agreement, Ricketts continues to "identify damages due to LG's defective [w]ork,"

which include costs related to amounts necessary to "complete and/or correct" LG's defective work and/or defective work performed at LG's direction, and has been damaged in an amount in excess of Ten Million Dollars. (*Id.*, 54)

31.     The Demand alleges that Ricketts is entitled to damages "as a result of LG's breach of the Construction Agreement." (*Id.*, ¶ 56)

### V.  LG'S UNDERTAKINGS IN THE CONSTRUCTION AGREEMENT

32.     The Construction Agreement provided that, except to the extent specifically indicated to be the responsibility of others, LG shall fully execute the Work described therein. (**Ex. B**, Art. 1)

33.     The Construction Agreement defined the term "Work" to mean "the construction and services required by the [Construction Agreement], whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by [LG] to fulfill [LG's] obligations." (*Id.*, § 6.3)

34.     The Construction Agreement provided that LG "shall supervise and direct the Work, using [LG's] best skill and attention" and that LG "shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work… unless the [Construction Agreement] give other specific instructions concerning these matters." (*Id.*, § 8.2.1)

35.     The Construction Agreement provided that LG "shall be responsible to [Ricketts] for acts and omissions of [LG's] employees, Subcontractors [and] their agents and employees." (*Id.*, § 8.2.2)

36.     The Construction Agreement included a section entitled "Warranty" which provided that LG warranted to Ricketts for a period of one year from the date of Substantial

6

Completion of the Project that materials and equipment furnished under the Construction Agreement will be of good quality, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform with the requirements of the Construction Agreement. (*Id.*, § 8.4)

37.     The Construction Agreement provided that Ricketts and LG "waive claims against each other for consequential damages arising out of or relating to this [Construction Agreement]." (*Id.*, § 9.11)

38.     The Construction Agreement provided that LG "shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the [Construction Agreement], whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Cost of correcting such rejected Work… shall be at LG's expense." (*Id.*, § 17.1)

39.     The Construction Agreement provided that, in addition to LG's obligations under § 8.4, "if, within one year after the date of Substantial Completion of the Work or designated portion thereof…any of the Work is found to be not in accordance with the requirements of the [Construction Agreement], [LG] shall correct it promptly after receipt of written notice from [Ricketts]" (*Id.*, § 17.2) and "the one year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual performance of the Work." (*Id.*, § 17.4)

## VI.     THE WESTFIELD POLICIES

40.     Westfield issued Policy No. CMM 0 239 311 (the "Westfield policy"), on which LG qualifies as a named insured. The policy had an initial policy period of January 24, 2013 to January 24, 2014 and was renewed annually until it expired on January 24, 2018. The policy and

renewals are hereafter referred to collectively as the "Westfield policies."

41.     Each of the Westfield policies included Commercial General Liability ("CGL") and Commercial Umbrella ("Umbrella") coverage parts. A copy of the Declarations and forms comprising the CGL and Umbrella coverage parts of policy that was effective during the period of January 24, 2017 to January 24, 2018 is attached hereto as **Exhibit C** and incorporated by reference herein. The relevant terms, conditions, and exclusions of both coverage parts during each period of the Westfield policies are the same as those set forth below unless otherwise stated.

42.     The top of the first page of the CGL Coverage Form states as follows:

> Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us" and "our" refer to the company providing this insurance.

> The word "insured" means any…organization qualifying as such under Section II. (**Ex. C**, p. POL 30).

43.     The Insuring Agreement of Coverage A of the CGL provides:

> **1.     Insuring Agreement**

> **a.**     [Westfield] will pay those sums that . . . [LG] becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies.
> *   *   *
> **b.**     This insurance applies to . . . "property damage" only if:

> **(1)**     The . . . "property damage" is caused by an "occurrence" . . .

> **(2)**     The . . . "property damage" occurs during the policy period; . . .

> *   *   *
> **c.**     "[P]roperty damage" which occurs during the policy period and was not, prior to the policy period, known to

have occurred . . . includes any continuation, change or resumption of that . . . "property damage" after the end of the policy period.

\* \* \*

**d.** "[P]roperty damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the . . . "property damage" to [Westfield] or any other insurer.

**(2)** Receives a written or verbal demand or claim for damages because of . . . "property damage"; or

**(3)** Becomes aware by any other means that . . . "property damage" has occurred or has begun to occur. (*Id.*)

44. The insurance provided by Coverage A is subject to Exclusions, providing that the insurance does not apply to any of the following:

**a.** **Expected Or Intended Injury**

"[P]roperty damage" expected or intended from the standpoint of . . . [LG] . . . (*Id.*, p. POL 31)

\* \* \*

**b.** **Contractual Liability**

"[P]roperty damage" for which . . . [LG] is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That . . . [LG] would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the . . . "property damage" occurs subsequent to the execution of the contract or agreement. (*Id.*)

\* \* \*

9

**j.       Damage To Property**

"Property damage" to:

*   *   *

**(4)**      Personal property in the care, custody or control of . . . [LG];

**(5)**      That particular part of real property on which [LG] or any contractors or subcontractors working directly or indirectly on [LG's] behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)**      That particular part of any real property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

*   *   *

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard." (*Id.*, p. POL 34 and 66)

**k.       Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it. (*Id.*, p. POL 34)

**l.       Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on [LG's] behalf by a subcontractor. (*Id.*)

**m.      Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not yet been physically injured, arising out of:

**(1)**      A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or

10

> **(2)** A delay or failure by [LG] or anyone acting on [LG's] behalf to perform a contract or agreement in accordance with its terms. (*Id.*)

45. Section IV of the CGL includes the following conditions:

> **2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**
>
> **a.** [LG] must see to it that [Westfield] [is] notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:
>
> > **(1)** How, when and where the "occurrence"…took place;
> >
> > **(2)** The names and addresses of any injured persons and witnesses; and
> >
> > **(3)** The nature and location of any…damage arising out of the "occurrence"…
>
> **b.** If a claim is made . . . against any insured, [LG] must:
>
> > **(1)** Immediately record the specifics of the claim . . . and the date received; and
> >
> > **(2)** Notify [Westfield] as soon as practicable.
>
> [LG] must see to it that [Westfield] receive[s] written notice of the claim . . . as soon as practicable.
>
> **c.** [LG]… must:
>
> > **(1)** Immediately send [Westfield] copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit" . . . ;
> >
> > **(2)** Authorize [Westfield] to obtain records and other information;
> >
> > **(3)** Cooperate with [Westfield] in the investigation or settlement of the claim or defense against the "suit"; and

**(4)**   Assist [Westfield], at our request, in the enforcement of any right against any other person or organization which may be liable to [LG] because of injury or damage to which this insurance may also apply.

**d.**   No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [Westfield's] consent. (*Id.*, p. POL 40)

**e.**   The requirement in Condition **2.a.** applies only when the "occurrence" or offense is known to:

\* \* \*

**(4)**   A manager, if [LG] [is] a limited liability company.

**f.**   The requirement in Condition **2.b.** will not be breached unless the breach occurs after such claim or "suit" is known to:

\* \* \*

**(4)**   A manager, if [LG] [is] a limited liability company.

g.   [LG's] rights under this coverage part will not be prejudiced if you fail to give us notice of an "occurrence" …claim or "suit" and that failure is solely due to your reasonable belief that the ….."property damage" is not covered under this Coverage Part. However, [LG] shall give written notice of this "occurrence"…claim or "suit" to us as soon as you are aware that this insurance may apply to such "occurrence"…claim or "suit." (*Id.*, p. POL 69)

**4.**   **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss [Westfield] cover[s] under Coverages A or B of this Coverage Part, [Westfield's] obligations are limited as follows:

\* \* \*

**b.**   **Excess Insurance**

**(1)**   This insurance is excess over:

&ast;  &ast;  &ast;

**(b)** Any other primary insurance available to [LG] covering liability for damages arising out of the premises or operations, or the products and completed operations, for which [LG] ha[s] been added as an additional insured by attachment of an endorsement.

&ast;  &ast;  &ast;

**(2)** When this insurance is excess, [Westfield] will have no duty under Coverages **A** or **B** to defend . . . [LG] against any "suit" if any other insurer has a duty to defend . . . [LG] against that "suit."… (*Id.*, p. POL 41)

&ast;  &ast;  &ast;

46.     Section V of the CGL contains the following Definitions:

**8.**     "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.**     It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.**     [LG] ha[s] failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or [LG's] fulfilling the terms of the contract or agreement. (*Id.*, p. POL 42-43)

**9.**     "Insured contract" means:

&ast; &ast; &ast;

**f.**     That part of any other contract or agreement pertaining to your business … under which you assume the tort liability of another party to pay for … "property damage" to a third person or organization.

Tort liability means a liability that would be imposed by law in the absence of any contract or agreement. (*Id.*, POL 70-71)

13

\* \* \*

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions. (*Id.*, POL 44)

\* \* \*

16. "Products-completed operations hazard":

 **a.** Includes all … "property damage" occurring away from premises [LG] own[s] or rent[s] and arising out of "your product" or "your work" except:

  **(1)** Products that are still in [LG's] physical possession; or

  **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

   **(a)** When all of the work called for in your contract has been completed.

   **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

   **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

  Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed. (*Id.*, POL 44-45)

\* \* \*

17. "Property damage" means:

 **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

 **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at

14

the time of the "occurrence" that caused it. (*Id.*, POL 45)

\* \* \*

18.    "Suit" means a civil proceeding in which damages because of . . . "property damage" . . . to which this insurance applies are alleged. "Suit" includes:

    **a.**    An arbitration proceeding in which such damages are claimed and to which . . . [LG] must submit or does submit with [Westfield's] consent; (*Id.*)

\* \* \*

21.    "Your product":

    **a.**    Means:

        **(1)**    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            **(a)**    [LG];

            \* \* \*

        **(1)**    Containers (other than vehicles) materials, parts or equipment furnished in connection with such goods or products.

    **b.**    Includes:

        **(1)**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product;" and

        **(2)**    The providing of or failure to provide warnings or instructions. (*Id.*)

\* \* \*

22.    "Your work":

    **a.**    Means:

        **(1)**    Work or operations performed by [LG] or on [LG's] behalf; and

        **(2)**    Materials, parts or equipment furnished in connection with such work or operations.

15

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

**(2)** The providing of or failure to provide warnings or instructions. (*Id.*)

47. The CGL is endorsed with a "Fungi or Bacteria Exclusion" endorsement which provides that the insurance does not apply to: as follows:

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of,  ingestion of,  contact with, exposure to, existence of, or presence of, any  "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew in any mycotoxinx, spores, scents or byproducts produced or released by fungi.
\* \* \*
"Fungi" means any type or form of fungus, including mold or mildew in any mycotoxinx, spores, scents or byproducts produced or released by fungi. (*Id.*, POL 21)

48. The CGL is endorsed with an "Exclusion – Contractors – Professional Liability" endorsement, which modified the insurance provided by the CGL as follows:

16

1.    This insurance does not apply to "bodily injury," "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

    a.    Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and

    b.    Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or on your behalf with respect to the operations described above.

2.    Subject to Paragraph **3**, below, professional services include:

    a.    Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

    b.    Supervisory or inspection activities performed as part of any related architectural or engineering activities.

\* \* \*

3.    Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor. (*Id*., POL 72-A)

49.    The CGL is endorsed with an "Exclusion - Exterior Insulations and Finish Systems" endorsement, which modified the insurance provided by the CGL as follows:

A.    This insurance does not apply to … "property damage"…arising out of, caused by, or attributable to, whether in whole or in part, the following:

17

1.    The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the Application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

2.    "Your product" or "your work" with respect to any exterior component, fixture or feature if any structure of an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

The following definition is added to the Definitions Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

1.    A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

2.    The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

3.    A reinforced or unreinforced base coat;

4.    A finish coat providing surface texture to which color may be added; and

5.    Any flashing, caulking or sealant used with the system for any purpose. (*Id*., POL 59)

\* \* \*

50.    The Umbrella contains a Coverage A Insuring Agreement, exclusions, and conditions substantially similar to those of the CGL, except that its notice and cooperation conditions are not modified by endorsement.

## VII.  ADDITIONAL RELEVANT FACTS REGARDING THE PROJECT

51.    The Project was to have been completed by March 30, 2014.

52.    On information and belief, due to delays in the progress of the Work, Ricketts and

her family were unable to move in to the Project until August 14, 2015.

53.     On information and belief, at the time Ricketts and her family moved into the Project, it remained unfinished.

54.     On information and belief, LG and/or its subcontractors continued to perform Work on the Project until June, 2016.

55.     On information and belief, upon moving into the Project, Ricketts continuously sent emails to LG and the Project architect, notifying them of construction defects she identified.

56.     On information and belief, the matters of which Ricketts notified LG and the architect included concerns regarding inadequate paint throughout the home, corners not being square, bumps in wallpaper, doors not properly sanded, leaks throughout the home and windows not properly closing.

57.     On information and belief, in September, 2016, the architect of the Project hired a consultant to inspect the leaking roof of the Project and the consultant identified defects in the roof, including improperly installed ice and water shield, gutters not pitched properly, inadequate flashing, downspout leaks, downspouts not connected to a sewer, improper materials used contrary to architectural drawings, ice damming and soffit leaks.

58.     LG became aware of substantial defects in the roof no later than November, 2016 and that the defects were caused in whole or in part by errors in the construction process made by LG's roofing subcontractor.

59.     On November 10, 2016, the architect of the Project wrote to LG's president regarding defects in the roof, stated that water was entering the Project because of them and that, if the defects were not corrected, it would only be a matter of time before interior trim separated, and also stated that repair of the defects would take weeks.

60.     On information and belief, LG declined to cause the roof to be repaired in accord with the architect's recommendation.

61.     Ricketts alleges that LG's failure to properly repair the roof has cost her over $1 million in repairs.

62.     On information and belief, LG failed to prepare a final punch list of Work on the Project that needed correction.

63.     On information and belief, in December, 2016, Ricketts hired a construction consultant to prepare the final punch list for the Project.

64.     On information and belief, the consultant identified defects in every room of the Project and 1200 items that required correction.

65.     On information and belief, LG was aware of leaks in the Lake Room of the Project in 2015, but did not address them effectively, such that they recurred thereafter.

66.     Ricketts asserts LG knew of many of the defects at issue in the Demand but failed to correct them, despite being provided notice and opportunity to do so.

## VIII. <u>NOTICE TO WESTFIELD AND THE STANDSTILL AGREEMENT</u>

67.     LG did not notify Westfield, or cause Westfield to be notified, of an "occurrence" and/or a claim by Ricketts in connection with the Project until on or about August 8, 2019.

68.     The notices of Ricketts' claim that were provided to Westfield represented that LG "had no notice or knowledge of claim for damages [by Ricketts] until receipt of attorneys [sic] 8/1/19 demand letter."

69.     Subsequently, Westfield, through its counsel, sent a letter to LG, advising of Westfield's position that it owed no coverage to LG for Rickett's claim.

70.     On or about April 21, 2020, Westfield's counsel had a phone conversation with

LG's corporate counsel, during which the corporate counsel stated that LG was surprised when it received the original Demand, was not expecting a claim from Ms. Ricketts, and disputed the merits of the Demand.

71. Thereafter, Westfield and LG entered into a standstill agreement in regard to all coverage disputes under the Westfield policies. A copy of the standstill agreement is attached hereto as **Exhibit D**.

72. The standstill agreement reflected that LG disagreed with Westfield's coverage position but agreed that, while the agreement was in effect, LG was not seeking a defense in the arbitration proceedings from Westfield.

73. Under the standstill agreement, Westfield agreed not to institute an action for declaratory judgment or other relief against LG while the agreement was in effect.

74. Under the standstill agreement, LG agreed that it would not claim that Westfield is estopped from asserting its coverage defenses based on an alleged failure to defend LG during the effective period of the agreement.

75. Under the standstill agreement, LG agreed to notify Westfield of any significant developments in connection with the arbitration proceedings.

76. The standstill agreement was continuously renewed by the agreement of Westfield and LG through April 15, 2023.

77. Prior and subsequent to April 15, 2023, LG's corporate attorney failed to respond to emails from Westfield's counsel, inquiring of the status of arbitration proceedings and whether LG wished to renew the standstill agreement.

78. On August 9, 2023, Westfield's counsel sent a letter by email to LG's corporate attorney, stating that LG had failed to respond to Westfield's emails regarding extension of the

standstill agreement, enclosing a draft complaint for declaratory judgment, and asking that the attorney "please advise how you would like to proceed."

79.     By letter dated August 15, 2023, a private attorney for LG wrote to Westfield's counsel, stating among other things that LG "understands that Westfield intends to terminate the standstill agreement and initiate coverage litigation."

80.     Westfield did not terminate the standstill agreement.

81.     In a phone conversation of October 17, 2023, the private attorney for LG confirmed to Westfield's counsel that "we have a standstill in place."

82.     In a phone conversation of December 1, 2023, the private attorney for LG again confirmed to Westfield's counsel that the standstill agreement remained in effect.

83.     In a phone conversation of January 11, 2024, the private attorney for LG informed Westfield's counsel that LG was terminating the standstill agreement.

84.     LG did not provide Westfield with any substantial information regarding the developments in the Arbitration until on or about September 5, 2023, when LG's private attorney provided Westfield's counsel with certain exhibits to the Demand.

85.     Among the exhibits provided on September 5, 2023 was a "punch list" prepared by an expert retained by Ricketts, dated June 12, 2019, and a report of another expert retained by Ricketts, dated November 16, 2020.

## IX. <u>BASIS FOR RELIEF</u>

86.     Westfield brings this action to secure a declaration of the parties' rights and duties under the Westfield policy.

87.     Westfield owes no duty to defend or duty to indemnify LG under the Westfield policies with respect to the claims made against LG in the Demand or the events alleged therein

for one or more of the following reasons, which are pleaded in the alternative and without prejudice to one another:

  **a.** The Demand does not allege an "occurrence" as that term is defined in the CGL and Umbrella and therefore does not fall within the Coverage A Insuring Agreement of the CGL or the Umbrella.

  **b.** One or more of the exclusions of the CGL and the Umbrella set forth hereinabove would apply to bar coverage for "property damage," if coverage was otherwise present, for the claims made against LG in the Demand.

88. In the alternative, and without prejudice to Westfield's positions as aforesaid, LG's delay in notifying Westfield of the events giving rise to Ricketts' claim, or of her claim, until August 2019, breached the notice conditions of the CGL and Umbrella and forfeited coverage, if any, to which LG was otherwise entitled.

89. In the alternative, and without prejudice to Westfield's positions as aforesaid, for more than three years after first notifying Westfield, LG failed to provide Westfield with information and documents regarding developments in the arbitration proceedings, breaching LG's agreement to do so in the standstill agreement and its duty to do so under the conditions of the CGL and Umbrella, materially hampering Westfield's investigation and possibly prejudicing its subrogation rights, thereby forfeiting coverage, if any, to which LG was otherwise entitled.

90. In the alternative, and without prejudice to Westfield's positions as aforesaid, Westfield has no liability for LG's attorneys fees and litigation expenses incurred in connection with defending the Demand or any predecessor Demands during the period that the standstill agreement was in effect because LG agreed that it was not seeking a defense from Westfield during said period.

91. In the alternative, and without prejudice to Westfield's positions as aforesaid, the CGL and Umbrella are excess to any policies of insurance issued to LG's subcontractors, on

which LG is named an additional insured, and will owe no duties to LG until such additional insurance is exhausted.

92.    Westfield's investigation into this matter is ongoing and Westfield reserves its right to expand on the defenses set forth herein and to raise additional defenses to coverage to the full extent warranted by the facts and the law.

93.    An actual and justiciable controversy exists between the parties hereto concerning coverage, if any, provided by Westfield.  Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court is granted the power to determine and adjudicate the rights and obligations of the parties hereto.

## X.  **PRAYER FOR RELIEF**

WHEREFORE, for the reasons set forth hereinabove, Westfield prays that the Court enter a judgment in its favor, finding and declaring that it owes no duty to defend or indemnify LG with respect to the claims made against LG in the Demand and/or the events and damages alleged therein, that Ricketts is entitled to no right, title or interest in the Westfield policies as a judgment creditor of LG, grant Westfield such additional relief as the Court deems just and equitable and award Westfield its costs incurred herein.

Respectfully submitted,

WESTFIELD INSURANCE COMPANY

By:    /s/ Richard T. Valentino
       One of Its Attorneys

Richard T. Valentino
ARDC No. 6188317
AMUNDSEN DAVIS, LLC
150 North Michigan Avenue, Suite 3300
Chicago, Illinois 60601
(312) 894-3392
rvalentino@amundsendavislaw.com