# Exhibit A

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| **Laura Ricketts**, as the sole beneficiary with power of direction under the Trust Agreement dated April 15, 2010 and known as Trust No. 8002354843, of which Chicago Title Land Trust Company is Trustee, | |
| Claimant, | **Case No. 01-19-0002-4280-1** |
| **v.** | **consolidated with** |
| **LG Construction Group LLC**, an Illinois limited liability corporation, | **Case No. 02-19-0002-4282-1** |
| Respondent. | |

## SECOND AMENDED DEMAND FOR ARBITRATION

Claimant, LAURA RICKETTS, as the sole beneficiary with power of direction under the trust agreement dated April 15, 2010 and known as Trust No. 8002354843, of which Chicago Title Land Trust Company is Trustee, by its attorneys Perkins Coie LLP for its Second Amended Demand for Arbitration against Respondent, LG CONSTRUCTION GROUP LLC, an Illinois limited liability company, states as follows:

## THE PARTIES

1. Claimant Laura Ricketts ("Ricketts"), as the sole beneficiary with power of direction under the Trust Agreement dated April 15, 2010 and known as Trust No. 8002354843 (the "Trust"), of which Chicago Title Land Trust Company is Trustee, is the owner of the property located at 430 Sheridan Road, Wilmette, Illinois (the "Property"), and, as such beneficiary, has the sole right to possess, manage, repair, maintain, and handle the Property.

2. The Trust and Ricketts are collectively referred to herein as the "Owner."

158943576.1

3.      Respondent LG Construction Group LLC is an Illinois limited liability company, with its principal place of business located at 2334 West North Avenue, Chicago, Illinois 60647.

4.      On information and belief, LG Construction, LLC is an assumed name under which LG Construction Group, LLC conducts business.  (*See* the Affidavit of Brian Goldberg attached hereto as "**Exhibit 8**," ¶ 3.)

5.      On information and belief, LG Construction, LLC and LG Construction Group, LLC are not separate legal entities and are referred to collectively throughout this Second Amended Demand for Arbitration as "LG." (*See* **Exhibit 8**, ¶ 3.)

6.      LG is in the business of building, among other things, custom, single-family homes, restaurants, boutique retail establishments, and multi-unit developments.  LG advertises that "[b]uilding is a monumental event, so [LG] want[s] to make sure the experience is not only enjoyable, but free of worry or unpredictability."

7.      The Owner and LG are collectively referred to as the "Parties."

## COMMON ALLEGATIONS

### I.      Nature of the Dispute

8.      In September of 2012, Owner retained LG to build what was expected to be a new and custom-built, luxury single-family home in Wilmette, Illinois (the "Project").  The selection of LG as the contractor for the Project was based on the recommendation of the Architect for the Project, Morgante-Wilson Architects, Ltd.  What the Owner ended up with in the summer of 2016, however, was a home riddled with significant construction defects due to, among other things, LG's failure to:

        a.      properly construct the Project in accordance with the Project Contract Documents;

2

b.      properly construct the Project in accordance with the industry standards, customs, and practice;

c.      properly manage the scheduling and sequencing of the trades for the Project;

d.      properly coordinate the construction and installation of materials and equipment with the Project Architect, Morgante-Wilson Architects, Ltd.;

e.      provide, coordinate, and install the proper materials for the Project;

f.      properly manage the overall work; and

g.      complete the Project as required.

9.      As a result of LG's numerous failures, the Project is riddled with multiple defects and unfinished work affecting virtually every room and every system in the home.  Such problems include, but are not limited to, defective millwork, defective painting and wall finishes, improperly installed windows and doors, defective flooring, improperly installed radiant floor heating, improperly performed electrical work, improperly installed interior and exterior plumbing and drainage, improperly installed exterior roofing and membranes, improperly constructed exterior kitchen and three-season porch, defective carpentry, failed and missing flashing, improperly installed stone work, defective tiling, defective HVAC systems, defective pool finishing and tiling, and improperly installed skylights.

10.     In certain instances, the defects were so extensive that Owner and her family were concerned about health and safety issues.  For example, due to the defective carpentry, improper roofing, and improper plumbing and drainage, water infiltration in the form of leaks, saturated insulation, condensation, and other water collection occurred in numerous areas throughout the home.  Such water infiltration damaged ceilings, walls, and floors, and resulted in mold growth, water stains, cracking, and other moisture-related defects in many areas in the home, including the main level living room, the basement family room, the natatorium, the perimeter of the main roof,

3

the three-season room and exterior kitchen above the south terrace, and around many window and doors.

11.     Further, the water infiltration and related damage was so extensive in the exterior kitchen and three-season porch that the exterior plywood sheathing decayed and deteriorated to the point of structural members crumbling to the touch, and it was saturated with significant amounts of biological growth and mold.  Both of these conditions created health and safety hazards for Owner living in the home.

12.     In other instances, improperly installed windows and other carpentry defects resulted in multiple windows being unable to open as designed by the manufacturer, putting Owner and her family at risk in the case of a fire, not to mention being unable to operate the windows as normally expected.

13.     Punch lists were prepared, but many of the listed items remain unfinished and were never addressed by LG.

14.     As a result of the numerous defects, unfinished work, and safety and health concerns, it will cost millions of dollars to remediate the damages and bring the home back to the condition LG was contractually required to provide.

## II.     The Project

15.     In June of 2010, the Trust, on behalf of its beneficiary, Ms. Ricketts, purchased the Property to allow Owner to construct her new and custom-built, luxury single-family home at the Property.

16.     On or around June 20, 2011, Owner, retained the architectural firm Morgante-Wilson Architects, Ltd. ("MWA" or the "Architect") to design the Project. MWA represented in

4

its proposal to Owner that MWA had the skill to "produce a very high-quality design that fulfills all the parameters of a project."

17.     MWA prepared a design for the residence that included, among others, the following features: an expansive entryway featuring exquisite millwork; spacious living and entertainment spaces with custom millwork, custom stone fireplaces, and high-end wall finishes including venetian plaster and textured wallpaper; an in-home theater with a custom, coffered ceiling; a high-end chef's kitchen with custom millwork, stone countertops, and stone flooring; an indoor swimming pool with a barrel-vaulted ceiling and custom millwork; multiple bedroom and guest suites all with custom millwork and custom stone and tile bathrooms; in-home offices with custom millwork and custom stone fireplaces; a third floor observation level with interior spaces and an exterior widow's walk; an interior relaxation lake room by Lake Michigan; an exterior breezeway kitchen; a three-season room with custom stone and a fireplace; and a multiple level outdoor entertainment space.

18.     MWA's design required high-quality finishes and installation work throughout the residence, which required a contractor to perform its work with high-quality craftsmanship and attention to detail when constructing the Project.

19.     The designs for the Project were issued for bid and, based on a recommendation by MWA regarding LG to be the general contractor for the Project, on or about September 29, 2012, the Owner entered into a contract with LG for the Project using a modified form of the AIA A107-1997 Abbreviated Standard Form of Agreement Between Owner and Contractor for Construction Projects of Limited Scope (the "Base Construction Agreement").

20.     The original construction price for the Project was Six Million Three Hundred Eighteen Thousand Six Hundred Eighty-Three Dollars and Thirty Cents ($6,318,683.30) (the

"Contract Sum"), which increased during the course of the Project by way of various subcontractor, contractor, and owner change orders, "Contract Adjustments," and certain credits issued (collectively, "Change Orders"). (A true and correct copy of the Base Construction Agreement and Rider dated October 1, 2012, and an Amendment dated October 1, 2012 are attached hereto and incorporated herein as "**Group Exhibit 1**.") The Base Construction Agreement and the Change Orders are collectively as the "Construction Agreement."

21.     On information and belief, the Change Orders are identified in the Applications for Payment Nos. 1 through 34 prepared by LG and MWA and Payment Application No. 34 is a summary of all Change Orders, reflecting the Contract Sum for LG's work of $9,965,465.06 (the "Final LG Contract Sum"). (A true and correct copy of Payment Application No. 34 is attached hereto and incorporated herein as "**Exhibit 2**.")

22.     The Final LG Contract Sum did not include two main categories of construction materials that LG was to coordinate and install:

        a.     Construction materials identified as "Owner supplied through MWA" costing $3,528,588.05 (from an original price of $1,816,575.00); and

        b.      "Owner Supplied" items and services costing $3,228,897.27 (from an original price of $338,698.00).

23.     Upon information and belief, the construction materials identified as "Owner supplied through MWA" were purchased and obtained by MWA to supply to the Project, with MWA being a direct vendor/supplier to the Project. Upon information and belief, attached is a list ("**Exhibit 3**" hereto and incorporated herein) of MWA's vendors that sold products and materials directly to MWA and MWA supplied those items directly to the Project. Such construction materials included, but were not limited to, the following:

        a.   cabinetry;
        b.   cabinet hardware;

6

c.  closet systems;
d.  exterior doors;
e.  door hardware;
f.  fireplace components;
g.  specialty flooring;
h.  garage doors;
i.  glass, mirrors, and acrylic panels;
j.  lighting;
k.  plumbing fixtures;
l.  stone and solid surfaces;
m.  tile;
n.  windows and doors; and
o.  wine components.

A list of these construction materials supplied by MWA is summarized in Payment Application No. 34, pages 6 and 7 of **Exhibit 2**.

24.     Owner reimbursed MWA for the cost of the construction materials incurred by MWA, plus a 10% mark-up based on construction material cost. (A true and correct copy of the AIA B151 1997 Agreement between Owner and Architect, and related addenda, are attached hereto as "**Exhibit 4**.")

25.     The direct "Owner supplied" items initially only included appliances and cabinetry, but landscaping and landscape architectural services were added as the Project progressed. (*See* **Exhibit 2**, p. 8.)

26.     LG was obligated to construct the Project (referred to herein as LG's "Work" as more fully defined in § 6.3 of the Construction Agreement) in accordance with the Construction Agreement and, specifically, the Contract Documents (as fully defined in § 6.1 of the Construction Agreement), including the drawings and specifications prepared by MWA.

27.     LG was also required to perform the Work in accordance with industry standards associated with and required in the construction of a new high-quality, custom, luxury single-family residential home. (**Group Exhibit 1**, Construction Agreement, p. 5, §§ 6.1, 6.3.)

7

28.     LG was required to coordinate, construct, and install in the Project the "Owner Supplied through MWA" construction materials and the other "Owner Supplied" items.

29.     LG was required to work directly with MWA with respect to the construction materials identified as "Owner Supplied through MWA."

30.     LG represented itself to the Owner that it had the experience and skill to provide the necessary work product and attention to detail on extremely complex, multi-million dollar, custom luxury homes, including constructing the Project employing high-quality craftsmanship to achieve high-quality finishes called for in the Architect's drawings and specifications.

31.     The Construction Agreement set forth duties and obligations of LG, including, but not limited to, the following:

 a. LG "shall supervise and direct the Work, using the [its] best skill attention" (**Group Exhibit 1**, p. 7, § 8.2.1);

 b. LG is to provide all labor and materials to perform its Work as set forth in Section 8.3;

 c. LG is to provide and pay for labor, materials, equipment, tools, construction equipment and machinery, transportation, and other facilities and services necessary for proper execution and completion of the Work whether temporary or permanent and whether or not incorporated or to be incorporated in the Work" (**Group Exhibit 1**, p. 7, § 8.3.1);

 d. LG is to "enforce strict discipline and good order among [its] employees and other persons carrying out the Contract" and "shall not permit employment of unfit persons or persons not skilled in tasks assigned to them" (**Group Exhibit 1**, p. 7, § 8.3.2);

 e. LG is required to "deliver, handle, store and install materials in accordance with manufacturers' instructions" (**Group Exhibit 1**, p. 7, § 8.3.3);

 f. LG is required to "make substitutions only with the consent of the Owner, after evaluation by the Architect" (**Group Exhibit 1**, p. 8, § 8.3.4); and

 g. LG was responsible for "acts and omissions of the Contractor's [LG's] employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors" (**Group Exhibit 1**, p. 7, § 8.2.2).

8

32.     The Construction Agreement also provides that LG "shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents" (**Group Exhibit 1**, p. 17, § 17.1) and shall reimburse the Owner "for costs incurred by the Owner which are payable to a separate contractor because of delays, improperly timed activities or defective construction of the Contractor [LG]" (**Group Exhibit 1**, p. 12, § 11.3.).

33.     LG's Work at the Project was defective in many areas and remains incomplete.

III.    **Construction of the Project**

34.     On information and belief, LG entered into multiple subcontracts with various trades, vendors, and suppliers to perform the Work for the Project, including, among others, the following:

        a.  CM Expert Flooring
        b.  Designed Stairs
        c.  Douglas & Company, LLC
        d.  Imperial Tile & Stone, Inc.
        e.  Migala Metal Design, LLC
        f.  Monroe Remodeling, Inc.
        g.  New Wave Creations
        h.  Quality Custom Install, Inc.
        i.  Quality Excavation
        j.  RDZ Stucco Enterprise, Inc.
        k.  Salvo Architectural Roofing
        l.  Solve Construction
        m.  Sport Court Midwest
        n.  The Woodworker
        o.  Top Notch Trim, Inc.
        p.  Town & Country Conservatories
        q.  Wooten Electric, Inc.

35.     On information and belief, LG further engaged LG Construction + Development, a company related to LG and that shares the same personnel and business address (2234 W. North Avenue, Chicago, IL) as LG, to assist LG with the management and construction of the Project.

9

36.     Upon information and belief, LG Construction + Development, on behalf of and acting with the full authority of LG, entered into additional subcontracts with various other trades, vendors, and suppliers to perform the Work for the Project including, among others, the following:

    a.  Aral Construction Corp.
    b.  Biagi Plumbing Corporation
    c.  Boilini Company
    d.  Chicago Town Construction
    e.  Chicago Waterproof Co.
    f.  DeCicco Contracting, Inc.
    g.  Hauter Brothers, Inc.
    h.  Quality Excavation, Inc.
    i.  Ruben's Spray Insulation, Inc.
    j.  Sturdi Iron
    k.  Sunrise Temperature Services, Inc.

37.     Construction of the Project took many months longer than originally agreed on between the parties due, in part, to LG's failure and inability to properly manage a project of its size, scale, and sophistication.  On information and belief, LG failed to regularly issue and use requests for information (RFIs) and other tools commonly employed during construction projects, relying largely on oral communications with the Architect and making changes in the field without supporting documentation.

38.     LG also changed project managers and/or superintendents numerous times throughout the course of construction without the knowledge or approval of the Owner, resulting in many inconsistencies with the progress of the Work, and further leading to defects, omissions, and lack of coordination in the performance of the Work.

39.     The Project was still incomplete in the late summer of 2015 when Owner moved into her home, but it was agreed between the parties that LG would continue to perform the Work, as the Project was already significantly delayed.  The amount of unfinished work was so significant

10

that LG and MWA continued to work to complete the Project for many months after Owner began living in the residence.

40.     After Owner occupied the home, she began to identify and continues to identify considerable defective, incomplete, and missing Work which is described in greater detail in Count I.

41.     As such defective and incomplete Work was discovered, LG was requested on numerous occasions to return to the Project to repair the defective Work.  In many instances, however, the Work was not corrected.

42.     A summary of the defective Work is detailed in a punch list prepared by Bulley & Andrews at the request of the Owner, a copy of which is attached hereto and incorporated herein as "**Exhibit 5**."   Over 1500 individual items identified on the punch list remain incomplete or in need of remediation, and the Owner discovered additional defective Work subsequent to the preparation of the punch list, as further outlined below.

43.     During remediation construction, Bulley & Andrews identified latent defects previously unknown to Owner and incorporated these items into its amended punch list, a copy of which is attached hereto and incorporated herein as "**Exhibit 9**."

44.     The Owner has satisfied any condition-precedent to this Arbitration, including as set forth in § 9.10 of the Construction Agreement (**Group Exhibit 1**, pp. 10-11).

## COUNT I: BREACH OF THE CONSTRUCTION AGREEMENT

45.     The Owner repeats and re-alleges the allegations set forth in Paragraphs 1-44 as if herein set forth in full for this Paragraph 45.

46.     The Construction Agreement was a valid and enforceable contract between the Owner and LG.

11

47.     The Owner performed its obligations under the Construction Agreement.

48.     LG breached the Construction Agreement in numerous ways including, but not limited to, the following:

a.      failing to perform the Work in accordance with the Contract Documents and in breach of, among other provisions, Article 1, §6.1, §6.3, §8.2.1, and §8.2.2 of the Construction Agreement (**Group Exhibit 1**);

b.      failing to perform the Work in a manner consistent with a contractor constructing a custom-built, luxury single-family residence similar in degree of quality and craftsmanship as that designed by MWA, and in breach of, among other provisions, §8.2.1, §8.2.2, §8.3.1 and §8.3.2 of the Construction Agreement (**Group Exhibit 1**);

c.      failing to perform its Work, including supervising and constructing, using its "best skill and attention," and in breach of, among other provisions, §8.2.1 and §8.2.2 of the Construction Agreement (**Group Exhibit 1**);

d.      employing unfit persons or persons not skilled in tasks assigned to them, including LG's project personnel and other trades, and in breach of, among other provisions, §6.3 §8.3.1 and §8.3.2 of the Construction Agreement (**Group Exhibit 1**);

e.      failing to properly oversee and manage the subcontractors, trades, vendors and suppliers in the performance of their respective work on the Project, and in breach of, among other provisions, §6.3 §8.2.1, §8.2.2, §8.3.1 and §8.3.2 of the Construction Agreement (**Group Exhibit 1**);

f.      failing to properly coordinate and document the Work being performed if there were clarifications, changes, modifications, or other issues related to the drawings and specifications issued by the Architect, and in breach of, among other provisions, §8.1.1, §8.1.2, §8.1.3, §8.2.1 and §8.7.1 of the Construction Agreement (**Group Exhibit 1**);

g.      failing to construct the Project in manner to make "parts fit together properly," in breach of, among other provisions, § 8.9 of the Construction Agreement (**Group Exhibit 1**);

h.      failing to correct Work that did not conform with the requirements of the Contract Documents, in breach of, among other provisions, §17.1 and §17.3 of the Construction Agreement (**Group Exhibit 1**);

i.      failing to properly account for credits due and owing to the Owner including, but not limited to, credits for wood stairs not installed (LG Change Order No. 20), removal of the copper standing seam roof (LG Change Order No. 51), modifications to the HVAC systems, and other un-apportioned credits owed; and

12

j.     failing to properly coordinate the installation of a significant percentage of the Project's construction materials as supplied by MWA (such as cabinetry, cabinet hardware, doors, door hardware, fireplace components, plumbing fixtures, stone and other solid surfaces, flooring, tile, and windows) and coordination of certain other materials supplied by the Owner.

49.    Examples of the incomplete and/or defective Work performed by LG includes, but is not limited to, the following:

a.    **Millwork**.

i.    The base molding, crown molding, column molding, specialty trim woodwork, and other millwork contains numerous material and workmanship defects including, but not limited to, the following: inadequate preparation and application; defective miter cuts resulting in excessive caulking to compensate for the poor workmanship, over-sanding, and other piecemeal repairs (*e.g.,* mismatched joints, open gaps, cracked caulking, improper corners and connections, missing caulk, etc.); defectively milled molding (*e.g.,* the existence of chatter marks, router marks, striated molding profiles, supply strap marks, etc.); defective curved millwork components (*e.g.,* ellipses with poor and unmatched segmented cuts, etc.); unworkmanlike and deficient installation of millwork in general (*e.g.,* gaps between molding and floors, numerous conditions of out-of-square, improperly aligned millwork, etc.); improper installation of the millwork associated with the doors and windows (*e.g.,* unevenly spaced framing, conditions out of level,

13

uneven and inconsistent reveals, and other conditions whereby the millwork is out of plumb); defective and deficient installation of the pilasters and associated millwork in various hallways in the residence (*e.g.,* pilaster spacing not plumb and not properly lined-up, deficient miter cuts, etc.); defectively installed cabinets (e.g., improper spacing, improper door finishes, etc.); and defective and deficient installation of coffered and other specialty millwork ceilings (*e.g.,* incorrectly installed ceiling in the home theater).

ii. In addition to the need to remove and repair the defective and deficient millwork found throughout the residence, such remediation work cannot be performed without removing and or damaging other Work installed in the related rooms. Certain portions of the walls and floors will need to be repaired, re-painted, re-plastered, and/or replaced when correcting the molding and trim; drywall will need to be patched or removed and replaced; countertops will need to be removed, reset, and, in certain instances, re-cut to properly fit the corrected millwork cabinets and trim; and certain doors and windows may need to be re-set as a result of the defective millwork.

b. **Painting, Wallcoverings, Plaster (Wall Finishes)**.

i. The painting, wallcoverings, and Venetian plaster wall finishes throughout the interior of the house contains numerous material and workmanship defects including, but not limited to, the following:

14

inadequate preparation of substrate (*e.g.,* the lack of or improper sanding, insufficient prime coat, unpainted surfaces, inadequately taped joints causing ridging of tape, lines, and uneven joints, etc.); defective finishes, uneven textures, inadequate materials (*e.g.,* improper and/or excessive incorrect caulking; scratches, drips, and debris in paint, gaps at joints, etc.); inadequate painting (*e.g.,* unpainted millwork edges, uneven stain, inconsistent paint and stain application, insufficient prime coat, improper painting method – brush or spray, etc.); and inadequate patching (*e.g.,* nail holes improperly patched and not sanded, cracks, over and under caulking, gaps at joints, etc.).

ii.  As a result of the defective wall finishes, other existing Work installed after the painting was performed, such as millwork, tiling, fixtures, window treatment, and other subsequently installed Work must be removed and either repaired or replaced entirely in order to remediate the defective and deficient wall finishes.

c.  **Windows**.

i.  The windows throughout the house contain numerous material and workmanship defects including, but not limited to, the following: improper installation (*e.g.* inconsistent window location and spacing, and installed conditions not even and square); windows that do not properly open or close, etc.); improperly installed sill extensions (*e.g.,* sill extension not in accordance with the Contract

15

Documents, window cranks inoperable or defective due to the positioning of the windows and size of sills, sills/millwork marred due to cranks, etc.); improper caulking and sealant application (*e.g.,* air and moisture infiltration and accumulation on sills and frames); the lack of or improperly installed flashing (e.g., water infiltration); and defective or damaged window hardware (*e.g.,* rusted crank arms and hardware, broken hardware, inoperable windows, etc.).

ii.  Such defective and deficient installation of the windows has resulted water infiltration, air drafts, and condensation conditions, thereby leading to mold growth and damage to the surrounding millwork and carpentry, as well as rusting the hardware of the window mechanisms affecting the operation of the windows.  Further, the installation of the windows in relation to the sills creates a condition whereby the window cranks cannot turn without damaging the sills or, in some instances, the cranks cannot turn at all making the window inoperable.  Remediating the windows may only be done by removing and/or replacing the sills and surrounding carpentry, millwork, painting, and other wall finishes.

d.  **Doors**.

i.  Various doors in the house contain numerous material and workmanship defects including, but are not limited to, the following: improperly operating sliding doors in the lake room; improperly operating exterior doors in the pool room, including

16

hardware problems; doors to the 2nd floor office and 2nd floor guest suite with improper or insufficient flashing; the lack of or improperly installed sealant; and improperly operating kitchen doors leading to the exterior kitchen.

ii. Such defective and deficient installation of the doors has resulted water infiltration, air drafts, and condensation conditions, thereby leading to mold growth and damage to the surrounding millwork, carpentry, painting, and other finishes.

e. **Hardwood Flooring**.

i. The hardwood floors throughout the house contain numerous material and workmanship defects including, but not limited to, the following: improperly installed hardwood floors (*e.g.,* flooring that is short from adjacent surfaces – gaps, misaligned flooring, squeaking floors, etc.); and warped and cupped floors.

ii. Such defects will require the removal and replacement of the millwork (floor molding, kickplates, cabinetry, etc.) in order to repair the defective floors which, in turn, will also requiring additional repainting of the adjacent walls in the affected areas.

f. **Stone**.

i. The stone in various areas of the house contains numerous material and workmanship defects including, but not limited to, the following: defective material (*e.g.* cracked stone countertops; cracked, scuffed and discolored stone fireplaces; etc.); improperly

17

sized and installed countertops and backsplashes (*e.g.,* guestroom on 2nd floor, kitchen, kitchenette area, kitchenette by the pool); cracked stone flooring in the kitchen; and improperly installed stonework in an unworkmanlike manner (*e.g.,* improperly fixed stone in the pool bathroom, missing grout and caulk in gaps, etc.).

ii. Remedying such defectively installed stonework will require the removal and replacement of millwork (cabinetry, floor molding, kickplates), the repainting and refinishing of various adjacent walls, the removal and replacement of tile and mirrored surfaces, and other elements in the residence in order to repair the defective stonework.

g. **Tile**.

i. The tile throughout the house, including tile floors and walls, contain numerous material and workmanship defects including, but not limited to, the following: gaps in the installation (*e.g.*, gaps in the tile floors, wall tiles, and between the tiles and adjacent surfaces); uneven edges and unevenly installed floor tiles; incorrectly installed tiles (*e.g.*, flipped tiles and incorrectly placed tiles); deficient workmanship (*e.g.*, excessive grouting, oversized faucet holes creating gaps between the countertop and the fixture); and improperly installed pool tile in the natatorium (e.g., tile falling off the pool walls).

ii. As a result of the gaps and poor installation work, water is able to seep behind the tiling thereby creating additional damage to the

18

supporting structure and leaks in the home. Additionally, in order to repair the defective tiling work, it will require the removal and replacement of electrical and plumbing fixtures, mirrors, stone countertops, millwork, painting and wall finishes, and other elements in the residence.

h. **Carpentry**.

i. The carpentry throughout the residence was contains numerous material and workmanship defects including, but not limited to, the following: improperly framed windows and doors; improperly framed and finished hallway pilasters; improperly framed bathroom areas; improperly framed exterior kitchen and exterior three-season porch; and defects in the carpentry around the perimeter of the main residence roof. Additionally, various windows and doors throughout also were not properly flashed, resulting in significant water infiltration, wood rot, and decay in the exterior kitchen and exterior three-season porch.

ii. As a result of the improper framing and other defective and deficient carpentry work, numerous other-installed systems are affected in the home, including wood rot and decay in the exterior kitchen and exterior three-season porch; improperly operating windows and doors; out of square and out of level rooms; leaks at the perimeter of the main residence roof; and wood rot and decay to the framing of the roof, as well as various dormer windows along the main

19

residence roof, all of which will require the removal and replacement of flooring, millwork, tile, stonework cabinetry, stucco, roofing materials, and rough and finish carpentry for both the main residence roof and the roofs for the three-season porch and the exterior kitchen, and other materials in order to correct the defective carpentry.

i. **Electrical**.

    i. The electrical system and associated components throughout the house contain numerous material and workmanship defects including, but not limited to, the following: uneven, non-flush, and improperly placed electrical wall outlets; misaligned lights and speakers; missing and non-functioning light fixtures; unsecured wiring; and missing, crooked, or improperly placed switches and covers.

j. **Plumbing**.

    i. The plumbing system and associated components throughout the house contain numerous material and workmanship defects including, but not limited to, the following: mismatched plumbing fixtures (*e.g.,* 2nd floor guestroom kitchenette); uninsulated pipes; and misaligned fixtures not flush with countertop; and leaky piping, resulting in water infiltration and damage to drywall, millwork, and painting and other wall finishes.

20

k.  **HVAC**.

      i.  The HVAC system throughout the house contains numerous material and workmanship defects including, but not limited to: uninsulated pipes, the improper installation of the HVAC controls system; and improperly-sized mechanical equipment, inappropriate placement of mechanical vents, and atypical noise. Additionally, the lower mechanical room remains unfinished with deficiencies that include, but are not limited to, unfinished wall and ceiling areas.

     ii.  Certain components of the HVAC system installed were insufficient, undersized, failed to properly balance and vent the air throughout the house, and were improperly or only partially installed, resulting in an HVAC system with excessive noise and that failed to operate with the intended design of the system for the residence. (See, Group Exhibit 10.) Further, the components selected by LG and its HVAC subcontractor was not in compliance with the system as originally designed. As a result, Owner was required to remove and replace multiple components of the HVAC system in order for the system to operate as intended, incurring thousands of additional costs to remediate LG's incorrectly installed system. (See, Group Exhibit 10.)

l.  **Radiant Heating System**.

      i.  The radiant heat flooring system was defectively installed and failed, as the radiant heat supply piping was punctured by nail(s)

21

during installation.  The puncture resulted in water leaking from the system and damaging the flooring and surrounding structure, which was further exacerbated when the nail(s) deteriorated over time thereby allowing additional moisture to escape from the system.

m.  **Building Envelope and Water Infiltration Issues**.  As set forth in greater detail in a November 16, 2020 report prepared by Wiss Janney, Elstner Associates, Inc. ("WJE") combined with WJE's April 21, 2021 supplemental report, there are numerous material and workmanship defects leading to water infiltration into multiple areas of the house and resulting in significant structure, health, and other damage to the residence and associated structures.  (True and correct copies of WJE's November 16, 2020 "Summary of Problems" report and its April 21, 2021 Supplement to Summary of Problems report are attached hereto and incorporated herein as "**Exhibit 6**" and "**Exhibit 7**," respectively.) Such water infiltration and related damages include, but are not limited to, the following:

i.  Water leaks in the lower level (basement) family room ceiling due to the failure to properly slope the roof deck on the north terrace roof as required by the Contract Documents; the installation of a steel beam above an adjacent deck not in compliance with the Contract Documents; the installation of roof drains at a height above the membrane level preventing the water from draining; the defective installation of the roof membrane and the failure to protect that roof membrane during construction; the installation of windows without sealant joints; and the failure to conform the work in accordance

22

with the Contract Documents and to conform to industry standards, customs, and practice.

ii. Water leaks in the first-floor living room ceiling and at the ceiling of a basement bedroom due to the failure to install, or the poor installation of, flashing beneath the second-floor guest suite balcony door; the failure to install perimeter sealant at the balcony door; the failure to install end dams; poor workmanship; and the failure to conform the work in accordance with the Contract Documents and to conform to industry standards, customs, and practice.

iii. Water leaks at the north basement corridor ceiling that occurred due to unsealed water barrier penetrations; the poor installation of flashing beneath the second-floor guest suite balcony; leakage through voids in a defectively installed membrane; the failure to recognize that breaches in water barriers and at certain interfaces must be sealed; poor workmanship; and the failure to conform the work in accordance with the Contract Documents and to conform to industry standards, customs, and practice.

iv. Water leaks at the ceilings and wall separating the indoor and exterior kitchen areas due to poor flashing beneath the second-floor office door and a failed sealant at the door threshold. These defects are the result of poor workmanship, the failure to install the flashing in accordance with the drawings, and the failure to conform the work

23

in accordance with the Contract Documents and to conform to industry standards, customs, and practice.

v. Water leaks at the ceiling of the basement natatorium due to the failure to sufficiently and properly slope the roof deck for the south terrace roof located the natatorium; the defective installation of the roof membrane and the failure to protect that roof membrane from damage during construction; poorly patched holes in the roof membrane allowing significant water to pond, create biological growth, and damage to the roof membrane; and the failure to conform the work in accordance with the Contract Documents and to conform to industry standards, customs, and practice.

vi. Water leaks at the ceiling of the potting room/solarium, causing staining on the interior masonry due to an unsealed gap between the top edge of the gutter and the sloped glazing framing; poorly installed gaskets and/or seals; the failure to install necessary sealants resulting in glazing leakage; and the failure to conform the work in accordance with the Contract Documents and to conform to industry standards, customs, and practice.

vii. Water leaks in the skylight and related enclosure in the hallway between the pool room and the lake room.

viii. Water leaks throughout the perimeter of the main residence roof due to improper roof installation, including an improperly installed ice and water shield, the failure to install a second layer of ice and water

24

shield as required by the Contract Documents, improperly installed flashing, and improperly installed facia boards, all of which allowed water to infiltrate and cause damage to the roofing sheathing, blocking, facia boards, and other components of the roof system, and other areas of the residence.

n. **Additional Building Envelope and Water Infiltration Issues**. As set forth in greater detail in **Exhibit 6** and **Exhibit 7**, there are additional material and workmanship defects that have created conditions which allow water to infiltrate and to damage other portions of the house and related structures including, but not limited to, the following:

    i. Extensive damage at the exterior walls and window systems for the three -season porch and exterior kitchen, including saturated, decayed, and deteriorated exterior plywood sheathing and wall frame members; biological growth on exterior plywood sheathing and wood wall framing members; staining and discoloration on the Tyvek and FlexWrap and fishmouths on the FlexWrap; incomplete seals between the FlexWrap and roofing membrane; no integration of the Tyvek and FlexWrap with the masonry backup wall at the chimney; missing through-wall flashing at the base of the masonry at the chimney and throughout the three -season porch and exterior kitchen; and FlexWrap not wrapped into openings. Such water infiltration was so pervasive that the three-season porch and exterior kitchen suffered from structural integrity issues.

25

ii. Water staining at the ceiling of the south basement corridor due to water dripping from the ductwork above the ceiling, improper pressurization of the natatorium, air and odor leakage from the natatorium into the adjoining spaces through unsealed penetrations, the failure to seal pipe penetrations, and the resulting water leakage.

iii. Excessive deterioration of the concrete masonry unit at the base of walls of the structures located on top of the south terrace roof due to improperly installed waterproofing membrane beneath and the failure to install the waterproofing membrane in accordance with the drawings and specifications.

iv. Screws/anchors used to anchor the railing system at the second-floor office terrace were poorly sealed or left unsealed, thereby allowing water infiltration at the exterior kitchen below and causing damage to drywall, painting and other areas where the water leaked into the residence. Such defective work is a result of a failure to conform the work in accordance with the Contract Documents and to conform to industry standards, customs, and practice.

v. Upper roof level downspouts were installed in a manner such that they deposit organic debris below the roof deck pavers on both the north terrace and south terrace roofs. Additionally, the roof drain(s) were designed and constructed without maintenance access. As a result, decaying organic debris (leaves) and biological growth occurs beneath the terrace pavers creating health hazards, areas for

26

insect and other additional biological growth, and further contributing to the deterioration of the roof membrane. Such defective work is a result of a failure to conform the work in accordance with the Contract Documents and to conform to industry standards, customs, and practice.

vi. Metal studs at the top of the east-west steel beam installed across the terrace roof penetrated the waterproofing membrane and were improperly sealed, thereby allowing water infiltration at those locations and further contributed to the leaks in the basement area and lower levels, damaging drywall, wall finishes and other elements of the residence. Such defective work is a result of a failure to conform the work in accordance with the Contract Documents and to conform to industry standards, customs, and practice.

50. The above-described list of defective Work is not an exclusive list of all of LG's defective Work and the Owner continues to discover additional defective Work.

51. Owner has been damaged by LG's defective Work and its failure to perform the Work in accordance with the Construction Agreement and in accordance with industry standards, customs, and practice in that Owner has incurred and will continue to incur significant costs to remediate and repair the defects and deficiencies to the Project caused by LG.

52. Owner has identified additional defective Work, not yet fully priced in **Exhibit 9**, and Owner is in the process of obtaining pricing to remediate such Work. This work includes, but is not limited to, defective or inoperable doors and door hardware on the doors leading from the

27

pool area to the exterior patio area, from the kitchen to the exterior kitchen, and in the lake room; defective or inoperable windows throughout the house; water intrusion and leaks into the main house along the perimeter of the main residence roof; and various other line-items represented **Exhibit 9** with an indication of "TBD" in place of a description of the full scope and price of the remediation work.

53.     Owner has been further damaged in that Owner already paid for various remediation services performed to date, including tens of thousands of dollars relating to the servicing and correcting of the HVAC system that was improperly installed and balanced by LG, and hundreds of thousands of dollars relating to the investigation and ongoing remediation of the significant water infiltration problems occurring throughout the house.

54.     As a direct and proximate result of LG's breaches, the Owner continues to identify damages due to LG's defective Work and has been damaged in an amount in excess of Ten Million Dollars ($10,000,000.00).  These costs include, but are not limited to, the amounts necessary to complete and/or correct the defective Work performed by, or at the direction of, LG.

55.     LG is obligated to reimburse the Owner "for costs incurred by the Owner which are payable to a separate contractor because of . . . defective construction of the Contractor [LG]." (**Exhibit 1**, p. 12, § 11.3.)

56.     The Owner is entitled to its damages as a result of LG's breach of the Construction Agreement.

28

WHEREFORE, Claimant, Laura Ricketts, as the sole beneficiary with power of direction under the Trust Agreement dated April 15, 2010 and known as Trust No. 8002354843, of which Chicago Title Land Trust Company is Trustee, request that the American Arbitration Association enter judgment in its favor and against Respondent, LG Construction Group LLC, in an amount to be determined at the arbitration hearing and such other and further relief as the American Arbitration Association deems just and appropriate under the circumstances.

Respectfully submitted,

**Laura Ricketts**, as the sole beneficiary with power of direction under the Trust Agreement dated April 15, 2010 and known as Trust No. 8002354843, of which Chicago Title Land Trust Company is Trustee

By: /s/ Michael J. Hanahan
     One of Its Attorneys

Michael J. Hanahan
Diana Z. Bowman
Perkins Coie LLP
131 S. Dearborn Street, Suite 1700
Chicago, Illinois 60603
mhanahan@perkinscoie.com
dbowman@perkinscoie.com
aavendano@perkinscoie.com

Dated: November 7, 2022

29